UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK (BROOKLYN)

UNITED STATES OF AMERICA,

           Plaintiff,

v.

JACOB DASKAL,

           Defendant.

Case No. 1:21-cr-00110-NGG-1

Brooklyn, New York
July 12, 2023
11:05 a.m.

TRANSCRIPT OF STATUS CONFERENCE HEARING
BEFORE THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Erin Reid, Esq.<br>Genny Ngai, Esq.<br>Ryan Costley<br>U.S. Attorney's Office<br>271 Cadman Plaza East<br>Brooklyn, NY 11201 |
| For the Defendant: | Henry E. Mazurek, Esq.<br>Ilana Haramati, Esq.<br>Jessica Becker<br>Meister Seeling & Fein, LLP<br>125 Park Avenue<br>7th floor<br>New York, NY 10017 |
| Clerk: | I.K. |
| Court Recorder: | Electronic Sound Recording |
| Transcription Service: | Chris Hwang<br>Abba Reporting<br>PO Box 223282<br>Chantilly, Virginia  20153<br>(518) 302-6772 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

(Call to order at 11:05 a.m.)

THE CLERK: Criminal cause for status conference, docket number 21-CR-110, the United States of America against Jacob Daskal.

Will the parties please state your names for the record?

MS. REID: Yes, good morning, Your Honor. Erin Reid and Genny Ngai for the Government along with Ryan Costley, our paralegal.

THE COURT: Good morning.

MR. MAZUREK: Good morning, Your Honor, Henry Mazurek, Ilana Haramati, and our paralegal Jessica Becker (phonetic) at counsel table with us, as well as Mr. Daskal.

THE COURT: Thank you.

THE CLERK: The Honorable Lois Bloom presiding.

THE COURT: Good morning, everybody, and thank you for being on time. The purpose of today's conference is so that we go smoothly through the jury selection process, which will be on Monday at 8:30 promptly in Judge Garaufis' courtroom.

So as the lawyers probably know in a case like this, we're going to call in I think we have 150 jurors that we're calling in. There is no way that we could fit 150 jurors into Judge Garaufis' courtroom.

So the purpose of today's conference is to make sure

everybody's on board with what I have directed the administrator of our jury plan to do and so that you'll know the set-up of the courtroom, so that you can be prepared. And that way, we're hoping will eliminate issues, logistical issues.

The second part of today's conference is to go over the questions that have been proposed, so that you know what to expect when I am going through the jury selection.

So the first is I'm going to ask my Law Clerk to give both sides a chart, which is still a work in progress and a list.

And the reason why the chart is a work in progress is in order to fit 75 jurors into Judge Garaufis' courtroom, we're going to bring in some extra rows of chairs, but as you probably know, there's an ELMO that can't be moved in the courtroom and we don't want anybody during the selections view to be blocked.

So this is the chart, the work in progress. And just so we're all on the same chart, what I'm going to do is put an extra row in front of the jury box.

Ms. Katsamedis (phonetic), if we could all focus together on the chart. I'm just doing logistics first, okay?

MR. MAZUREK: Yes.

MS. REID: Of course, Judge.

THE COURT: So I'm going to put a row in front of the

jury box. So that means that we're going to have to 28. We need to qualify 36 in order to do the peremptories.

So the question is how much the ELMO is going to block, but even to get 75 into the courtroom, we're going to have to bring an extra row of chairs, we think, before we start doing the selection just to fit 75 physically in the courtroom because we don't put anybody into the box until we've given the overview and we start placing people into the box.

So we have ordered some chairs that will go in the front row. The 25 through 36 is actually to qualify the jurors, but there may be a row in front just to fit everybody in while I'm giving the general instructions and the lay of the land.

So I don't want you to think that this chart is written in stone. It may move a little bit, but if we have to move it, we'll give you the number, so that when you're looking at it, you'll know who's in which seat and that was our effort in just drawing up this rough chart today. Any questions about the chart or seating?

MS. REID: No, Your Honor. No.

THE COURT: Mr. Mazurek?

MR. MAZUREK: No, Your Honor.

THE COURT: Okay, so the other piece was that I've told the jury administrator to bring 75 in for the 8:30. They never get there right at 8:30, but I want all of you there at

8:30, because I think the early bird does get the better jurors okay? The people that are on time are better jurors. And if people are going to ask to be excused, we should get to them as soon as possible, but we have to go through the process. So I want all of you in Judge Garaufis' courtroom 8:30.

We're not closing the courtroom, but it will be difficult for this number of spectators to be there. There is going to be an overflow room, I understand, for press and for people.

So, for the jury selection, I'm not closing the courtroom, but I want you to understand fitting 70 people into that room is difficult.

I'm going to have my interns and my law clerks getting the jurors into the right places, but I just want you to know, Mr. Mazurek, that if you have two rows of people, I don't know where I'm putting them for the -- if they want to sit at your table, that's a different story, but you're going to have introduce anybody who's at your table. Okay, so you'll make all of these decisions.

Of course, Mr. Daskal, you'll be there, but I'm just saying your family and friends, we're going to have a packed courtroom to do the selection.

The jury selection gets winnowed down and then they'll be able to come in, but at the start with 75 people in the back of the courtroom, it's tight, okay?

MS. REID: Excuse me, Your Honor if I could --

THE COURT: Yes.

MS. REID: Will there be an overflow room during jury selection?

THE COURT: I believe that they're trying to set that up.

MS. REID: Perfect, thank you, Your Honor.

THE COURT: That's what I'm hoping.

MS. REID: Thank you.

THE COURT: I've asked and it's Judge Garaufis' Deputy Joey Reccoppa, who has said that he's made the request. And my understanding is it will be for the entire length of the trial, so that I don't have to worry about this issue of getting everybody to fit in the courtroom. That's my hope. Okay, so that's logistics on fitting in the room.

MR. MAZUREK: On --

THE COURT: Yes, Mr. Mazurek?

MR. MAZUREK: One question. With respect to the lists of the jurors that are being called in?

THE COURT: It's going to be the same order that I get. I'm not giving you a crazy mixed-up list.

MR. MAZUREK: Is there any way that we could get them in advance of Monday?

THE COURT: No.

MR. MAZUREK: No.

THE COURT: They don't do that.

MR. MAZUREK: They don't do it.

THE COURT: They see who shows up literally on the day of jury selection and they generate the list once people show up. There is no way for them to tell you who's going to show up even if they know who's being called.

MR. MAZUREK: Okay.

THE COURT: And there's at least eight other juries that I believe are trying to be selected at the same time, which is --

MR. MAZUREK: Oh, on that day?

THE COURT: Which is why I want to be here first. Okay? Okay. So any other questions about the list, fitting in the room?

MS. REID: No, Your Honor.

THE COURT: Overflow, you could ask those questions to Judge Garaufis, but my understanding is that they're making arrangements.

Okay, so the next issue is the list that I intend not to read into the record, but instead, intend to give to each -- oh, let me step back for one second. I think that the Government understands, but make sure that Mr. Daskal's counsel understands.

So, in other words, I have them give us judge's lists, Mr. Mazurek.

MR. MAZUREK: Yes.

THE COURT: So it's judge's lists. So it's number one will be in seat number 1 closest to me on this list. And, again, you're going to have the same list I do with the same names of jurors. So it's not like you're going to have to scramble to figure out who's 1.

But as you know, if Juror Number 1 gets struck for any reason, then I'm going to have to pull somebody who may be number 40 to sit in Number 1. And all of that I will make sure I say so that you're up on it, okay?

MR. MAZUREK: But is it sequential? I'm sorry, is it sequential?

THE COURT: It is.

MR. MAZUREK: Okay.

THE COURT: It is sequential. And there will be no challenges for any reason from the well. Any challenge has to be made at sidebar.

And at sidebar, you should speak to your client whether he needs to come, whether we need to six people to come or it's just going to be one lawyer coming up on each side.

All of you should speak about that because the amount that we could cut -- I'm not telling you you must, but the amount of back and forth that we can cut down on, the quicker a jury selection would go.

So I intend to call the first group of 75. We'll

hope 75 show up for the 8:30.

MR. MAZUREK: Yeah.

THE COURT: And then, I hope to get by lunch time to qualify as many from that 75 as we can, let that group go to lunch, make sure they come back after lunch, but do the other 75 while the first group is out to lunch.

Why am I telling you that? Bring food. Have it in your briefcase. I won't break for lunch. I will go straight through because if there are jurors that are waiting, I want to get this done.

Okay, so bring your energy bars or whatever else it is that you --

MR. MAZUREK: And no cafeteria?

THE COURT: No cafeteria, but sandwich in the briefcase does still work, okay?

MR. MAZUREK: I'm vegan, so I need to figure out how.

THE COURT: You'll have to figure that out. That I can't help you with. Sorry. All right.

MR. MAZUREK: And when is the afternoon panel coming in?

THE COURT: I'm telling them to come at 1:00.

MR. MAZUREK: 1:00.

THE COURT: But that's wishful thinking. I don't really know that we'll be able to get everything done so that I could start promptly at 1:00, but at least if they're called at

1:00, they won't be all angry that they've sat since 8:30 in the morning.

MR. MAZUREK: Understood.

THE COURT: So that was my thought.

Any objection, Ms. Reid?

MS. REID: No, Your Honor.

THE COURT: Any objection, Mr. Mazurek?

MR. MAZUREK: No.

THE COURT: Okay. Let's move on to the list. Thank you. So the list is what I propose to put on everybody's chair. So instead of reading it into the record, we will say I'll ask you now to review the list.

The issue is I can't have Jane Does. And I know that this has been presented, but I'm not making the decision. I believe what we're going to do and you're going to have to supply this, but I'm not there yet is you'll have to give me whatever the pseudonym is of the people who are testifying.

And instead of Jane Doe, we'll put in the pseudonym and we'll put in whatever the name is, but we won't call attention to it.

So, in other words, in the list that you gave me, and I don't think that Defense counsel gave me a list. I think only the Government did, but you identified Ms. Reid as the Prosecutor. I'm not putting any identification.

And the reason why we've put numbers, which we don't

generally do, is then we can avoid if somebody thinks that they know somebody who is -- I know you don't want me to use the word victim, but for purposes of today.

MR. MAZUREK: Complaining witness.

THE COURT: Complaining witness. If the complaining witness' name is on this list and somebody thinks they know the complaining witness, they'll say number 6 and they won't say the name in open court.

MR. MAZUREK: I'm sorry, but I -- when we're saying that we're going to put a pseudonym, how would they know if they know the complaining witness?

THE COURT: They're going to put both.

MR. MAZUREK: Oh, they're going to put both. I'm sorry, I wasn't following that.

THE COURT: I'm not sure what Judge Garaufis is going to do.

MR. MAZUREK: Right.

THE COURT: But I know your motions in limine have discussed this issue. And if Judge Garaufis allows you to use a pseudonym for the complaining witness, then I am going to put the pseudonym into the list as well as the complaining witness' real name, but they're going to be listed alphabetically, so nobody's calling attention to either of these names.

And then, if anybody thinks they know them, they're going to say I think I know number 5. And that way, we can

have somebody --

MR. MAZUREK: You will instruct them beforehand only identified by number as opposed to name?

THE COURT: That's correct.

MR. MAZUREK: I'm fine with that, Your Honor.

MS. REID: Your Honor, it's a little premature because we don't know what Judge Garaufis will do. He may deny the motions all together.

THE COURT: I'm just trying to come up with --

MS. REID: Yes.

THE COURT: -- a theory of what I will do --

MS. REID: Yes.

THE COURT: -- having looked at the motions in limine, but I have no dog in that fight.

MS. REID: Yes.

THE COURT: I'm just trying to come up with a way that with the motion in limine still pending, we're going to create a list.

I assume that we're going to have either the real name, a pseudonym, or both on the list, but it's going to have a number next to it. It's going to be in alphabetical order. It's not going to say who that person is.

MS. REID: Yes, and I think our request, again depending on the motions, is that only the pseudonym would be on the list. That's how I've done it in the past with

pseudonyms.

The jury's never given the real name. It's not on any documentation, but again, this is premature because we don't know what the decision will be. I just wanted to raise that now.

THE COURT: And I understand that this has come up in other cases. And I do believe that public disclosure of the names isn't necessary. So I will assure everybody that these lists will be given to the court reporter, but they're not going to be entered on the court docket.

So once the list is approved and it's on everybody's seat, we'll use the list for the purpose of the jury selection, but they're not going to be publicly disclosed.

MS. REID: Uh-huh.

MR. MAZUREK: And --

MS. REID: That's fine, Your Honor. I just would still maintain our request is that it would not appear, assuming that a pseudonym is permitted, that the true name would not appear.

THE COURT: I understand your position --

MS. REID: Yeah.

THE COURT: -- but I don't know how we can assess whether any of the jurors know any of the potential people if we didn't use a true name for the purpose of jury selection, but I'm not deciding that issue. I'll wait for Judge Garaufis'

decision.

And I'm telling you if Judge Garaufis says use the pseudonym, but for the purposes of the selection, you could also list the name of the true person, that they'll both appear alphabetically with a number next to them, okay?

MS. REID: Yes, Your Honor.

MR. MAZUREK: Understood.

THE COURT: Okay. Any objection, Ms. Reid? You could state your objection is that you'd only want the pseudonym of the protected witnesses.

MS. REID: Yes.

THE COURT: And Mr. Mazurek?

MR. MAZUREK: No objection as to --

THE COURT: Okay.

MR. MAZUREK: -- how Your Honor's described the potential process.

THE COURT: The other thing is we have the entities and the locations. And I'm going to tell the people that they don't have to raise their hand if they know where Borough Park is or even if they live close to Borough Park because every witness is going to have to tell us where they -- not every witness.

Every potential juror is going to have to tell us where they live, but living in that community does not necessarily make them prejudiced for any reason. And we're

just trying to seek people who are not biased and could decide this case with an open mind.

So I'm going to say knowing where South Fallsburg is or Borough Park does not automatically disqualify anybody because I don't want people raising their hand saying I know where Borough Park is to get out of this, okay.

Same thing with the Shomrim and the high school. Any objection?

MS. REID: No, Your Honor.

MR. MAZUREK: No, Your Honor.

THE COURT: Okay. If somebody knows somebody, I generally ask them to raise their hand. And if they tell us the number that's the pseudonym, I'll have them come up, or if they tell us the number, assuming that the witness will be disclosed, I'll have them come up to sidebar.

But for anybody else, I generally have them answer from their seat. And the only joke that my Law Clerk said I should make is that it's not James Taylor, the singer songwriter, so that they don't all raise their hand about that guy, okay? All right, any other questions about the list?

MR. MAZUREK: Just one question. I don't know whether you want to include our law firm in this list or?

THE COURT: If you think that we should, then give us the name and how it's spelled and we'll put it on the list.

MR. MAZUREK: Okay, great. Thank you.

THE COURT: I didn't get anything from you on that topic, so I didn't list anything.

MR. MAZUREK: No, I understand.

THE COURT: I want you to look it over now. And my chamber's email so that you don't have to file it on the docket is bloom_chambers@nyed.uscourts.gov.

So only for the permission of both sides if there are additions to the list. I do not want to print 70 copies of it, come down in the morning, and have you say, oh, we forgot something and have to go re-print.

MR. MAZUREK: We don't want that either. I'm an environmentalist.

THE COURT: Yes. So a vegan and an environmentalist, okay. So just make sure you review the list again in the quiet of chambers. And if there's any changes by tomorrow, give them to me, okay? Anything else about these two which were the logistics?

MS. REID: No, Your Honor.

MR. MAZUREK: No, Your Honor.

THE COURT: Okay. So moving on, as I said, I do have my general script, but you have both given me a number of questions. And happily for me, a lot of the questions are both reasonable, but there's a significant amount of overlap between the two lists of questions.

So I do differ -- I note differences on some of the

framing and specifics. So I want to specifically speak about them. I haven't 100 percent decided where I come out. Do you have your lists of Government's and Defendant's proposed voir dire?

MR. MAZUREK: Yes, they're before us.

THE COURT: Okay. Very good.

And Ms. Reid, you're on top of it, too?

MS. REID: Yes, Your Honor.

THE COURT: Okay, so on Hasidic bias, the Government's question is 11 and Defendant's questions are 14 through 18. So my whole aim here is to get a fair and impartial jury. It is not to beat anybody over the head with anything.

And so that's what I need your help with. So, again, the Government is Question 11. And Defendant's Question 14 through 18.

I thought 14 was okay, but I didn't like the end of it. I'm not really here for a tutorial about have they heard anything about Hasidic Jewish tradition, Borough Park, Williamsburg. I'm not interested in that.

I'm interested in whether or not they can be fair and impartial in this case. So I was okay with you will hear evidence in the case that Mr. Daskal practices a certain ultraorthodox form of the Jewish religion, sometimes called Hasidic Judaism.

The members of this sect of Judaism are sometimes called Hasidic Jews, Hasids, or Hasidim. Indeed, some of the testimony in the case will be about the practices of this religious sect.

I'm then fine to say will anything about that make it difficult for you to be a fair and impartial juror in this case, but I'm not interested in the rest of 14 and I'm going on about 15, 16.

Again, I'm open to talking about 17 because 17 talks about that there may be separation of men and women, and some of the other things that may impact somebody's ability to be fair and impartial. I'm telling you where I am on this, so that we can sort of guide the conversation.

On the Government's question, which again, was 11, their question is do you have any biases or prejudices against members of racial, ethnic, national, or religious groups that would make it difficult for you to be fair and impartial? Do you have any knowledge about the parties or the case that might influence you in deciding the case? Would you be able to set aside any sympathies or biases you may have for any of the parties in reaching a verdict?

I think that's like three questions. That would be a compound question objection. So I -- I'm interested in trying to get an agreement on how much to ask about basic prejudice, and in this case, prejudice specifically that might affect Mr.

Daskal.

MR. MAZUREK: I'm happy to start --

THE COURT: Go ahead.

MR. MAZUREK: -- if that's okay with the Court. So, Judge, in my experience in what we call as jury selection but I think it's more appropriately entitled jury exclusion because we're really trying to identify those jurors who may infect the jury process with their prejudices and unconscious bias.

That simply stating a question in most general terms of whether you have heard of this religious sect and, you know, is that going to make you somehow not be able to be fair and impartial, the evidence that we need a little bit more detail and specifics.

It's usually -- I believe that it's in the specifics when people start to understand and then maybe talk about some of the issues that might not consciously be biasing them, but there is, you know, a lot of studies that show that there's unconscious bias in the presentation of people who have to evaluate evidence at jury trials.

So that's the one reason why we've tried to include a little bit more detail. And particularly there's -- there are three areas that concern me in this field, you know, in this particular case, where there are a number of sensitive and tricky topics that are going to be discussed that could evoke really strong emotions by anyone and specifically here jurors.

So, first, I do believe if you look at, you know, I've done like recent Google searches of Hasidim, Brooklyn, New York, there have been a number of what I will call pieces in the local New York press that have been --

THE COURT: Can I just stop you for a moment?

MR. MAZUREK: Yes.

THE COURT: One of the things that is most depressing for me about doing jury selection, which I love to do otherwise, is when I ask the jurors what is your source for news and nobody reads any newspapers anymore. Literally people say whatever's on my phone. Or my best answer ever from a juror, my wife, she tells me whatever I need to know, okay?

MR. MAZUREK: Yeah.

THE COURT: So, your concerns, I understand, but I don't want to put ideas into jurors' head. I agree with you. This is Mr. Daskal's life.

MR. MAZUREK: Yes.

THE COURT: And I understand completely that we want to get at anybody who could infect the jury with prejudice or bias.

But I also know that I don't want to suggest things and have people start raising their hands because it's a convenient way to relieve themselves of their obligation as citizens.

MR. MAZUREK: Right, and I'm aware of that as well,

Your Honor.  And I think that, you know, the three topics -- I mean, by asking them if they have seen something, and I agree with you, I don't think anyone reads newspapers today, but what they do do are Google-type searches on web browsers and see what the, you know, top page elicits.

And right now, that top page that I, you know, have dancing on the computer myself and saw what are very derogatory pieces, just the headlines.

And I know people are in -- we're in the TikTok Internet age of where, you know, two minutes is about the attention span of people, but that attention span is concerning to me in that even if they look at the headlines on a web browser, they -- the headlines are not flattering.

And that is my concern that in particular in New York right now and the Eastern District where the jury venire's coming from, they have --

THE COURT:  Oh, but again, to make sure that the family knows, it's Staten Island.

MR. MAZUREK:  Okay.

THE COURT:  -- Queens, Brooklyn, Nassau, and Suffolk County.  So, again, yes, we are the Eastern District, but it draws people from Riverhead, who may know nothing about Borough Park, never set foot in it, don't know anybody who is Hasidic.

And I just don't want to plant things in people's minds as a reason why they should try to get off this jury.  So

I agree with you that we want to get rid of anybody who has any bias or prejudice and that the news is not good.

If you're a front page "Post" or I don't know, "Daily News" reader, it's likely, but we are going to ask have you heard, read, or seen anything about Mr. Daskal, that's for sure.

But asking if they've read press about Hasidic people in Brooklyn or Googled it, I don't think -- I understand your point, but I don't think that's what we want to do here.

MR. MAZUREK:  But I think that what we want to sort of elicit is those who have -- and I'm not asking whether it's been bad or good or, you know, indifferent, those people who have seen something on the Internet or in press or in the media.

THE COURT:  Do you know there's something called racism in this country?  Do you think that I should ask at every case where the person is a minority member --

MR. MAZUREK:  I do.

THE COURT:  -- whether or not there's any reading of press about racism?

MR. MAZUREK:  I think that certainly race should be a subject that, you know, and what kinds of things that people are reading.

THE COURT:  Again, I hear your point, but I would like your help.  So let's continue on that thought about what I

could do, because I'm not going to ask before today have you read, seen, or heard anything about Hasidic Jewish tradition and its people?  I'm not asking that.

MR. MAZUREK:  Okay.

THE COURT:  This is not a tutorial.

MR. MAZUREK:  I know, Your Honor, but I mean, with respect to the Hasidic tradition and practices, there's going to be specific evidence.  There's going to be a lot of evidence in this case about that.

THE COURT:  Well, that's why I'm going to ask the beginning of that question.  And I was okay about going to 17, where you may hear evidence that men and women are treated differently in the Hasidic Jewish tradition, including the separation of men and women at the temple or synagogue.

I don't know that we need to go into requirements that women dress in a certain way and wear wigs.  I don't know if we need a tutorial on Hasidic traditions.

I think that we need to root out people who will in infect or have unconscious bias, but I don't think we need a tutorial on the Hasidic tradition.

MR. MAZUREK:  But I understand, Your Honor.  I mean, I guess the points on specifically, you know, obviously I would like to know whether they formed any opinion.

THE COURT:  Of course.

MR. MAZUREK:  So that's I think number 15 that might

be difficult for --

THE COURT: But again, I'm asking questions that are directly related to whether it will be difficult to be fair and impartial. So again --

MR. MAZUREK: I think 15 is fine.

THE COURT: That's fine.

MR. MAZUREK: Okay.

THE COURT: Do you have any objection to 15?

MS. REID: No.

THE COURT: So we'll keep 15 in and I'll keep the beginning of 14 in, but I'm not going to go on to have you heard or read anything about Borough Park, Williamsburg? I just -- that is not what I need to flesh out.

MR. MAZUREK: I don't belabor that point.

THE COURT: Okay.

MR. MAZUREK: You made your fair position very clear. So with respect, let me tell you what we're -- what I was thinking with respect to 16 and 17. It's not so much an issue of informing or educating the panel about the traditions about Hasidic Jewish culture.

It's more that once they hear that evidence, which we highly expect will be part of the testimony in this case, whether in fact it's going to invoke the sort of prejudices or biases that can come as a result of things they don't know are necessarily connected to the Hasidic culture.

For example, the separation of men and women. There may be things that are being told to them during the trial where it would seem to someone who does not practice in that religion, that men and women are treated unequally in --

THE COURT: But this is the whole thing. The questions that I'm asking are giving them a preview of what you expect the evidence will be and I try to avoid that at all costs. I do not want to be previewing. That's not my role.

My role is to get a fair and impartial jury seated. And I agree with you that we have to, and Judge Weinstein, you know, our hero, he was somebody in one case I showed an unconscious bias. It was in the jury selection process. It was a tape made in I think the Western District of Washington that had been sent around.

MR. MAZUREK: Yes.

THE COURT: And everybody went crazy. I was the one that was the magistrate judge selecting for Weinstein. He was okay with it. I was okay with it. Everybody went a little bit crazy.

So I can tell you unconscious bias is a big buzzword, and there are real repercussions of it, but I don't want to plant any ideas in jurors' mind about what the evidence will be. That is not my job.

MR. MAZUREK: But, Judge, I mean, with all due respect, I mean, my concern is, you know, that's --

THE COURT: So if you want to talk to me about 17 because we got to get through this in the next half an hour --

MR. MAZUREK: Yes.

THE COURT: -- talk to me about 17 what you think is really necessary. And I'm not asking something like might this impact your ability to judge evidence about these religious practices?

I'm not asking that. Again, people are scared to be in the courtroom, Mr. Mazurek. They're scared to be in the courtroom.

And might it impact, I mean, really, you're just trying to see whether somebody already comes into the courtroom with preconceived notions of what this is all about. And I'm not trying to give them more preconceived notions of what this is about.

If you want to look at 17 and see how you think that might fit, or 16, I've already told you I'll give 15 and I'll give the beginning of 14.

And I've already said I'm giving 12 about whether or not they've heard anything about Mr. Daskal, the charges about him, et cetera, but --

MR. MAZUREK: But I guess we could continue to use the language that we used in the -- I mean, the standard general language that most of the judges give about might it impact your ability to be a fair and impartial juror in this

case. I mean, I don't know that is --

THE COURT: I don't use might it impact. And I don't ask for opinions. I ask would this make it difficult for you to by a fair and impartial juror.

MR. MAZUREK: Okay.

THE COURT: Okay, because I don't want them to have to speculate because people are scared. They want to answer honestly. They've taken an oath, all right?

MR. MAZUREK: Okay, we can -- I mean, I'm fine, so long as but I do want the subject matter to --

THE COURT: So you want me to ask --

MR. MAZUREK: -- be explained enough.

THE COURT: -- you may hear that men and women are treated differently.

MR. MAZUREK: But I think giving some examples would help to identify what we're talking about, otherwise, it's so general that, I mean, I don't know how people would be able to elicit any kind of response.

THE COURT: But what does that have to do with the case that's being tried?

MR. MAZUREK: Because my client is a male. The complaining witness is a female. If there are people who are sitting in the jury and hear that the religious traditions on their own somehow place men and women in different positions and some might suggest or infer based on their everyday modern

lives that it's actually -- it subjugates women to the position of men, they may have a bias or prejudice against Mr. Daskal as a result of hearing that kind of evidence, that kind of testimony and evidence about that the culture itself is somehow subjugating the complaining witness here, which is not something that is a fair and objective piece of evidence in the case. It's just that the tradition itself puts a prejudice in the minds of the juror to say that there's a premise here.

THE COURT: Let's hear Ms. Reid on this point. Thank you.

MS. REID: Your Honor, I agree with you. This shouldn't be a tutorial. And honestly, I think there's many other practices that we could list here. We can't even get through all of them that might be mentioned in this case.

I think the emphasis on the word strict at the end of 16 was a good one because I think ultimately that's what we're talking about, right, is strict or religious practices that the jury might practice in their life or might be used to.

And I think just maybe something more general about if you were to hear about a religious practice that was more strict than what you are used to, would you -- would that affect your ability to be fair and impartial?

THE COURT: He wants it to be more specific. You want it to be more general. How can we get both of these? This is Mr. Daskal's trial. So I am inclined to give an -- you

know, to give a question that will get at things, but I again say in every case we have some of these issues. And it's not my role to tell people what the evidence will be or how the case will play out.

I do want to get people, for instance, if the Defendants are from a Caribbean island, I want to make sure that nobody who's picked on the jury is prejudiced against people who come from that Caribbean island.

So I want to give Mr. Daskal that same fair play, but I do not want to go into all the tenets of Hasidic Judaism and what the evidence may show, because I have no idea what the evidence may show and I don't want the jurors to have that in their mind.

So now, with that, tell me in 16 and 17 because I've already agreed to 14 and 15?

MR. MAZUREK: Well, can I just say, I mean with -- I mean, I do think that there needs to be a way of having a juror understand that the kinds of differences that they may hear between the treatment of men and women, I think that is very important here.

THE COURT: It's more important than the Internet and technology.

MR. MAZUREK: Yeah, but although, you know, there are lot of people who do unfortunately today think it's almost child abuse to prevent children from having access to these

kinds of things.

THE COURT: Oh, please, let -- please.

MR. MAZUREK: I'm being very serious in fact. I mean --

THE COURT: Well, again, Mr. Mazurek, that is not going to be what we're talking about. How people raise their kids with screens is not part of my case, okay? I'm doing a jury selection here. I'm not really interested in going way out. If you're saying that 17 is more important than 16, which is what I'm hearing.

MR. MAZUREK: That is true.

THE COURT: Okay, so help me with 17. So can I take out --

MR. MAZUREK: Yeah, I have a suggestion.

THE COURT: Can I keep it as you may hear --

MR. MAZUREK: Okay.

THE COURT: -- in this -- I don't want to say evidence. You may hear that men and women are treated differently in Hasidic. Take out evidence in this case because I don't know what the evidence will show. Is that all right?

So you may hear that men and women are treated differently in the Hasidic Jewish tradition including separation of men and women at temple or synagogue and the requirements that women dress in a certain way.

MR. MAZUREK: I know you're going to stop there,

right?

THE COURT: Yes, is that okay?

MR. MAZUREK: Yes, that's fine.

THE COURT: And if you hear testimony that men and women are treated differently in Defendant's Hasidic tradition, do you want me use Defendant or in the Hasidic tradition and take out Defendant?

MR. MAZUREK: No, I think I want that it's clearly, I mean, that the Defendant is in the traditions of --

THE COURT: Okay, in the Defendant's Hasidic tradition, would this make it difficult for you to be fair and impartial in this case?

MR. MAZUREK: I'm fine with that, Your Honor.

MS. REID: And so is the Government.

THE COURT: Thank you. Just please look back, Mr. Mazurek, to 16 make sure there's nothing there because I'm inclined to leave that out.

MR. MAZUREK: Okay. Well, since you've rejected my idea that the banishment of screens from youth is not child abuse, I will --

THE COURT: I can't imagine in this case how that's really going to come up. So I'll just --

MR. MAZUREK: I'll be surprised.

THE COURT: Okay, I'll just let it be though, okay?

All right, and I think 18, just like the Government's

question being too broad in 11, I think 18 is too -- I mean, I'm really asking people specifics about would it be difficult to you to be fair and impartial and I asked 8,000,000 different ways if they'll be able to be fair and impartial to Mr. Daskal.

So, I'm not going to hit them over the head with based on your prior views of Hasidic Jewish tradition, because I don't know that anybody has any prior view. So I'm inclined to leave 18 out.

MR. MAZUREK: Okay, I understand. And maybe go back to 14, so I understand exactly how 14 will be given?

THE COURT: 14 will be you'll hear evidence in this case that Mr. Daskal practices exactly as you have at a certain ultraorthodox form of the Jewish religion, sometimes called Hasidic Judaism. The members of the sect of Judaism are sometimes called Hasidic Jews, Hasids, or Hasidim. Indeed some of the testimony in this case will be about the practices of this religious sect.

Would any of that -- would Mr. Daskal being a member or would Mr. Daskal's practice of Hasidic Judaism make it difficult for you to be fair and impartial in this case? How's that, Mr. Mazurek?

MR. MAZUREK: I'm thinking, I'm sorry. Would Mr. Daskal's, I'm sorry, practice?

THE COURT: Practice.

MR. MAZUREK: Of being.

THE COURT: No, practice of Hasidic Judaism.

MR. MAZUREK: That's fine.

THE COURT: Any opposition from the Government?

MS. REID: No, that's fine, Your Honor.

MR. MAZUREK: And then you would give 15 as it's drafted in our submission?

THE COURT: Yes, but no, if yes explain.

MR. MAZUREK: You don't like the jurors to talk?

THE COURT: If they're going to talk, they'll talk at sidebar. I don't want one juror to infect everybody else.

MR. MAZUREK: No, I understand. Happy to individually talk to them.

THE COURT: And if there are multiple people that raise their hand, we'll come to sidebar. And I hate the white noise machine, but we'll put the white noise machine on and we'll hear what they have to say.

So, again, decide who needs to come to sidebar. If it's everybody, so be it. We'll get the court reporter to have a setup at sidebar and we'll all listen to what each person says.

MR. MAZUREK: Judge, a suggestion. I think, you know, in the past in jury selection processes, I found that if there's like a maybe a chamber -- a room in chambers or away from the mass of people and it's somehow makes people more comfortable.

THE COURT: No, no, no, no, no. Believe me, I lived through Covid. We had to do every jury selection individually in separate rooms. We were in the ceremonial courtroom. It took forever to move people in and out. There no reason for it. The white noise machine masks it. We can speak at sidebar. You'll get to see the people as they speak.

And if it's a challenge for cause, you'll let me know, but not while they're right in front of me. And if somebody breaks into tears, and is dissembling in front of my eyes, I may not even ask you and I'll send them back and say thank you very much for your service, okay? I'm pretty decisive in these --

MR. MAZUREK: I see.

THE COURT: -- jury selections. I just want to get the fair and impartial jury that your client is entitled to, okay?

MR. MAZUREK: Okay.

THE COURT: All right, so that's Question 1. Let's go to --

MR. MAZUREK: It's a good discourse.

THE COURT: Yes, it sets us up well. History with sexual assault, Government's questions are 3 and 4. Defendant's questions are 8 through 9 and 11. So please look at those questions.

I thought 3 and 4 were fine. I thought that we're

probably going to have -- this of the Government's. I think that we're probably going to have to have them come to sidebar for these questions. Just like if you're the victim of a crime, I don't expect people to say what happened to them in open court. So that is what I thought that I would ask 3 and 4.

Going to Defendants Questions 8 through 9 and 11. 8, I think, is really overbroad, Mr. Mazurek. because if anybody in their household was marching as part of Me Too movement, why don't we just ask has anybody seen "Prima Facie" on Broadway and did they like it, you know. I'm sorry, that was a joke.

MR. MAZUREK: I didn't see it.

THE COURT: It was about sexual assault. I'm just saying that, you know, having somebody in your household who may have done anything, protested as part of Me Too movement, I don't think is relevant here.

It's -- I've been asked this in other cases. Has anybody in your family marched in the Black Lives Matter movement. I don't think these are relevant questions. So I would not be inclined to ask 8.

MR. MAZUREK: But Judge --

THE COURT: 9, I think is the important question. And 9, I have no problem trying to merge your 9 with their 3 and 4.

MR. MAZUREK: Okay, can I go back to 8 just for a

brief second and I won't belabor it?

THE COURT: Yes.

MR. MAZUREK: But if your concern is the term protested, I wouldn't mind taking out protested.

THE COURT: No, because lobbying, petitioning, working.

MR. MAZUREK: But people who are actively involved in womens' rights movements with respect against sexual abuse and harassment, I think is important for us to determine in our questioning to make sure that they're -- I mean, that is a particular prejudice or bias that might exist.

THE COURT: Again, that's not what this is asking about though. It's asking whether they ever supported any organizations.

I support, even though I'm not giving them money, lots of things that organizations and are working against sexual harassment. I'm actually married to somebody who is a lawyer, who takes those -- I mean, again, I don't think that this question will get at what you're intending. I think it will be too broad and sweep in people that we don't have any right to ask them about.

MR. MAZUREK: But if they're spending a significant amount of either their professional life --

THE COURT: Is that what it says? It says you --

MR. MAZUREK: No, but I'm happy to wordsmith.

THE COURT: -- or a family member ever supported, lobbied, petitioned, protested, or worked in in any other manner for or against any laws, regulations, or organizations related to sex trafficking, sex crimes against minors, sex abuse, sexual harassment, or the Me Too movement. That's very broad.

MR. MAZUREK: I took this from Judge Nathan's questionnaire.

THE COURT: That was just Ghislaine Maxwell.

MR. MAZUREK: Yes.

THE COURT: A little bit different. Sex trafficking is very different than what we have here.

MR. MAZUREK: It still has to do with -- you know, it's a form of -- I mean, sex abuse is definitely a topic here.

THE COURT: Again, if Judge Nathan used it God bless her. She's very smart. I'm not using this question. Do you want to help me reform it?

MR. MAZUREK: Yes.

THE COURT: Okay.

MR. MAZUREK: How about just saying lobbied or worked?

THE COURT: Have you or a family member ever lobbied or worked for or against any laws related to sex trafficking, sex crimes against minors, I can't get the sex abuse, sex harassment. What's for or against sex abuse? I mean, again,

does -- do you want to ask does everybody hate Harvey Weinstein? What are we doing here? Sorry.

MR. MAZUREK: No, I -- look, I mean, I do think people who have made it -- what I'm trying to get at is that those people who have made it their -- have dedicated a substantial part of their life or time or efforts in this particular area, this field, because I do think it makes it harder for someone who has done that and has listened and --

THE COURT: I'm hearing you so help me reform the question.

MR. MAZUREK: Okay. Okay, I'm going to work with you.

MS. REID: Your Honor, what if it just ended after maybe sex trafficking of minors and sex crimes against minors. Or just take out sex trafficking because I agree it's not really a issue here.

THE COURT: This isn't a sex trafficking case, but I do understand that you want people who may have strong views about these issues, but I don't want it to include this long list of supported, lobbied, petitioned. I think have you or a family member ever worked.

MR. MAZUREK: Or volunteered. I mean, some people, you know, volunteer for these nonprofits, not necessarily work for salaries or --

THE COURT: I'm good with volunteered. I'm just not

good with lobbied, petitioned, protested, okay.

MR. MAZUREK: Yes.

THE COURT: Worked or volunteered. Now let's come up. Worked -- have you or a family member or close friend, let's make everything, right, ever worked or volunteered for an organization, a group or organization regarding sex crimes against minors or sexual abuse in general. How about this? And please, both sides.

MR. MAZUREK: Yes.

THE COURT: Have you or a family member or close friend ever worked or volunteered for a group or organization regarding sex crimes, period. Let's not plant the minor. Let's not talk about trafficking.

MR. MAZUREK: I'm going to ask also sexual harassment in addition to sex crimes.

THE COURT: For a group or organization regarding sex crimes and/or sexual harassment. Is that -- I'll read it again.

MR. MAZUREK: Actually, could it be sexual abuse or harassment? I think abuse is also very important here considering. I understand you don't want to put minor but abuse is definitely a concept.

THE COURT: The reason why I was taking out minor was to give you a broader net.

MR. MAZUREK: Yes, I'm -- but I guess I would ask for

abuse with harassment.

THE COURT: Okay, let me read it again so both sides will hear. Have you or a family member or close friend ever worked or volunteered for a group or organization regarding? So I'm not going to say what the organization is for or against, organization regarding sex crimes and/or sexual abuse or harassment.

MR. MAZUREK: That works for Defense.

MS. REID: That's fine, Your Honor.

THE COURT: Okay, so I've taken out the Me Too. I've taken out sex crimes against minors. I'm taking out social activism. And, again, and if so, will it affect your ability it be fair and impartial in this case?

MR. MAZUREK: Yes. You're going to say, yes, please explain?

THE COURT: I'll have them come to sidebar. Every once and a while, you get a, you know, jury selection where nobody knows lawyers and nobody knows cops. It's an amazing thing. Sometimes that happens.

MR. MAZUREK: It's hard to believe.

THE COURT: I know. Okay, so I've now reformed 8.

9 is sort of a conglomerate of the Government's, right? The Government's was --

MR. MAZUREK: The Government's 4, I guess is --

THE COURT: 3 and 4.

MR. MAZUREK: Yes.

THE COURT: Do you have any problem with me asking if they've been prosecuted or sued --

MR. MAZUREK: No, I don't have --

THE COURT: -- for sexual misconduct?

MR. MAZUREK: I know that the Government would want that just as we want to know if they're a victim.

THE COURT: Yes. And then, 4 is sort of your 9, right?

MR. MAZUREK: Yes, I would just ask for a sort of more specific sentence -- second sentence in number 9.

THE COURT: Do you have any problem me giving his laundry list of stranger, acquaintance, supervisor, teacher, mentor, foster parent, or family member?

MS. REID: No, Your Honor.

THE COURT: So I'll keep that in. I think you should have added in date, but it's just me.

MS. REID: I guess that's stranger or acquaintance, but --

THE COURT: Yeah, it's fine. I'll leave it be.

MR. MAZUREK: Do people date these days?

THE COURT: Okay, I wouldn't know.

MR. MAZUREK: Neither would I.

THE COURT: Okay, so let's move on. Now we've gotten through history with sexual assault. Now we're at Government 2

and 5 and Defendant's 2 and 3, sexual abuse of a minor.

MR. MAZUREK: Yes.

THE COURT: So compare yours to theirs.

MR. MAZUREK: Did you say number 5?

THE COURT: The Government's are 2 and 5 because of the nature of the charges, you may be required to review sexually explicit communications. Oh, no, I was reading 6.

2 and 5 of the Government is the law provides that individuals under certain ages can not consent to sexual activity with other individuals.

MR. MAZUREK: Yeah, I don't -- I mean, I'm sure the Government wants that one, so I don't have any.

THE COURT: Do you have an opposition?

MR. MAZUREK: I don't have an opposition.

THE COURT: Okay. And so, going back to yours on the same notes, yours were 2 and 3.

MR. MAZUREK: Yes, and --

THE COURT: I'm not going to say would they create they create an emotional or reactionary response. I could --

MR. MAZUREK: What I was trying to get at there is that as someone who was in the HR's advisory group at my law firm, there is -- there are these civil laws that are trigger questions that would be required as employers to ask of our employees.

That if they are going to be working on a matter that

involves potential, you know, sexual explicit information, does that in any way cause you to have a reaction that's going to make it difficult for you to, you know, to undertake the task that you're being assigned? So I wanted to --

THE COURT: Well, we're talking about two different things here. We're talking about their ability to evaluate the evidence fairly, right?

And I think, you know, the Government's Question 6 is also about this. Because of the nature of the charges, you may be required to review sexually explicit. That's -- they're trying to get at the same thing.

MR. MAZUREK: No, I think it's -- there are -- well, I mean, there are people who may, while they may not be a victim themselves or have close family or friends who were victims, there is, you know, the reason for the employment law.

THE COURT: So if you just cross out the emotional reactionary response, I'm okay with it. So witnesses in this case may testify about sexual abuse or sexual assault of a minor. Would the nature of these charges make it difficult for you to be fair and impartial in this case?

MR. MAZUREK: Right, I mean, the issue that I don't want to completely abandon is the fact that these kinds of charges might cause someone to be too emotional or not be able to focus on factual evidence, because of the nature of the charges. So I would like some sentence that incorporates that.

THE COURT: So, I thought your, just going to it, your 6 and 7, which you might hear evidence of messages, conversations, or testimony that includes explicit discussion of sexual acts or patterns of sexual activity.

These statements may be read aloud or testified about at trial. Do you believe that the exposure to such graphic evidence may affect your ability to hear and consider the evidence in the case with an open mind and your ability to remain objective and impartial? I'm fine as long as I can change it to instead of remain completely objective.

MR. MAZUREK: You don't like our emphasis sometimes.

THE COURT: So, I'm okay about that, but again, I don't want to beat people over the head with what we're expecting them to hear or how they're expected to react. There are stoic people.

So look at 6. Again, I'm fine with everything up until the end. Do you believe the exposure to such graphic evidence may affect your ability to hear and consider the evidence in the case with an open mind and your ability to be objective and impartial? So I'm not even changing it to make it difficult for you to be fair and impartial. I'm keeping your language there.

MR. MAZUREK: Okay.

THE COURT: And then in 7, you might hear sexually explicit evidence in this case about adult pornography. Do we

know that that's coming in?

MS. REID: No, Your Honor.

THE COURT: So why am I saying it?

MS. REID: I mean --

THE COURT: Are you introducing adult pornography into this?

MR. MAZUREK: I mean, there's evidence in -- on the phones of adult pornography. And I think that there may -- that may become an issue at trial, yes.

THE COURT: Ms. Reid?

MS. REID: And it really depends on -- I don't think it would be part of the Government's case in chief, but if the Defendant were to testify, I could imagine that coming up. So I don't know if that's important enough for the Defense.

MR. MAZUREK: I mean, we haven't made any decision whether at this stage obviously whether the Defendant's going to testify, but I certainly -- if I don't want to -- I mean, an issue that is as inflammatory.

THE COURT: We have so many other issues here. We have underage sex. Why would adult pornography be on your mind if we have underage sex?

MR. MAZUREK: Okay.

THE COURT: I'm -- I'm just, again, trying to get -- if there was absolutely going to be, you know, if it's a child porn case, we need to talk about child pornography at

the -- at voir dire. But this is really a Mann Act, sexual acts with a minor case. That's enough.

MR. MAZUREK: Yeah, while it might be enough, it's not complete in terms of the type of elements that are going to be --

THE COURT: But I'm asking witnesses if they hear evidence of sexual activity and graphic evidence. I've already said yes to that. Why do we need more?

MR. MAZUREK: Because I do think the fact that if it comes into evidence, that our client, I mean, through the use of devices was looking at adult pornography sites and images, that might influence them in a emotional and prejudicial way.

THE COURT: Okay, so let me just tell you where I am on this. Two, I'm giving you about sexual assault of a minor with the nature of the charges change anything.

I don't think that I should ask about 4 and 5, adultery, patterns of sexual acts that run counter to people's religious or personal beliefs. I think that's overkill.

I've already said to you that I'll keep in 6. I'll keep in 2. We're asking about whether or not people have ever been a victim.

Your 3 is the same as 4 on the Government's. Yours is asking a witness in this case may claim to have been sexually abused as a minor. Would you view her testimony differently than any other witness only because she is alleging

underage sexual abuse?

MR. MAZUREK: Sorry, we've moved on what number is that?

THE COURT: Yours, number 3.

MR. MAZUREK: Oh, yes. I mean, this is just pattern to the sort of standard instruction that we give to law enforcement's making --

THE COURT: I understand, but you're asking will they give more credit to law enforcement or less credit? Will they automatically believe or disbelieve law enforcement because they're law enforcement?

MR. MAZUREK: Yes. And that's --

THE COURT: Here, we're not saying are you going to automatically believe or disbelieve her testimony because she's alleging underage sexual abuse.

I am going to include that, by the way, that every witness should be judged on their own credibility.

MR. MAZUREK: Right, but in this particular instance, in this kind of crime, Your Honor, I think that there are people who come into this process thinking that if the person is willing to testify in open court on these kinds of issues, then it must be true.

So I'm starting with the premise that I'm giving extra level of credibility just like they would with someone with a badge. I mean, we know that that's wrong under the law,

but I think we need to weed out those kinds of people.

THE COURT: Yes?

MS. REID: I would just say that that's already addressed by many other questions, but specifically number 2. That's the whole point of this. And I think it just gives it too much emphasis to ask it especially in this way, Your Honor.

I think Your Honor's suggestion of just the typical instruction about witnesses and you have evaluate them fairly and impartially.

MR. MAZUREK: But these are, I mean, this is a very specific instance where --

THE COURT: So let's just stop for a second. If I use your first sentence, a witness in this case may claim to have been sexually abused as a minor, would you be able to view her testimony fairly and impartially?

MR. MAZUREK: Would you be able to say that, would you able -- your testimony as you would any other witness in the case?

THE COURT: Any other witness in the case?

MR. MAZUREK: Yes, that each witness is supposed be judged in a --

THE COURT: How about would you be able to view the credibility of her testimony as any other witness --

MR. MAZUREK: Yes.

THE COURT: -- in this case.

MR. MAZUREK: Yes. You said it more artfully.

MS. REID: Your Honor, I would just still object to it. I just think it's bizarre to call that out. We don't do it in any other case where the victim of a crime testifies. And I don't see why we would do it here.

We do do it for law enforcement. That's standard. And Your Honor's going to go it for witnesses. And we're going to get at this issue a thousand different ways, talking about the nature of the charges, but I think calling it out specifically is just not appropriate.

THE COURT: I hear what you're saying, but because Mr. Daskal is the Defendant in the case, I'm going to craft it, put it with the other question, so it's not standing out on its own.

And it will read a witness in this case may claim to have been sexually abused as a minor. Would you be able to view her -- the credibility of her testimony the same as any other witness?

MR. MAZUREK: Thank you, Judge. And I just would ask -- I know that you've said you're disinclined to give number 5. The reason I think it is important and maybe we can fold it into --

THE COURT: I'm not.

MR. MAZUREK: -- religious practices?

THE COURT: I'm not.

MR. MAZUREK:  Because I think people judge --

THE COURT:  Adultery is not what's at issue here.

MR. MAZUREK:  That's my concern.  That's exactly my concern because I think that they hear adulterous behavior.

THE COURT:  I'm not going to do the adult pornography and I'm not going to do the adultery.  I want to hear you on 4 to see whether or not that's anything I have to say because I have to tell you I'm quite uncomfortable with 4.

So 6 is in.  You've won against Ms. Reid on 3.  We have 2.  I'm keeping in the case-specific questions that the Government has as well, but you're up to 4.  Tell me why you think I need to talk about oral and anal sex?

MR. MAZUREK:  Because I think that jurors need to hear specifically what kinds of sexual acts may be --

THE COURT:  Again, you heard me say that I don't like to preview what the evidence is.  I like to give the broad title and make sure that people aren't going to, excuse me, freak out in the courtroom about it --

MR. MAZUREK:  Yeah.

THE COURT:  -- but I don't know what the testimony will be.

MR. MAZUREK:  Just like a homicide case, you're going to tell them that there's going to be murder scenes.

THE COURT:  No, more like in a drug case, I need to make sure that nobody close to them has been, you know, an

addict.

MR. MAZUREK: But if someone believes that there's going to be evidence of what's considered in some cultures or religious practices as sexual deviancy, that that in and of itself could cause a prejudice against my client.

THE COURT: I understand that lots of things could cause, but I'm hear to pick a fair and impartial jury. And I'm not here to talk about all the things that might happen during the trial.

MR. MAZUREK: But this is a significant one because it impacts people's judgment on individuals based on very deep-seated religious and cultural practices.

THE COURT: But you made the same argument about adultery and I've already told you I'm not going to talk about adultery. I'm just not.

MR. MAZUREK: Adultery is not going to be the centerpiece, but other kinds of sex, including oral and anal sex is going to be.

I think, you know, jurors when they hear those specific words and conduct, it's going to cause them to have -- feel a certain way. And I don't want just because they feel a certain way based on their background.

THE COURT: Okay, so help me boil this down because I am really --

MR. MAZUREK: Okay.

THE COURT: -- wanting to be done here.

MR. MAZUREK: Yes, I understand.

MS. REID: Your Honor, can I just say, though, I don't -- we never do this in the CP cases. Like those cases also involve all sorts of kind of --

THE COURT: Child pornography cases.

MS. REID: -- child pornography, but they involve all sorts of different kinds of sexual acts. And we don't delineate. And in murder cases, we don't delineate. We just don't do that. Yet, we're talking about sexually explicit evidence. I think that's enough.

MR. MAZUREK: I would just say -- if we're going to -- we're talking about sexually explicit evidence in another question. Can we just add including evidence of --

THE COURT: So in 6 --

MR. MAZUREK: Yes.

THE COURT: -- which I have said I will give, which is you might hear evidence of messages, conversations, testimony that includes explicit discussion of sexual acts or patterns of sexual activity.

MR. MAZUREK: Can we add a comma including oral or anal sex?

THE COURT: Is that in the conversations?

MR. MAZUREK: Yes.

MS. REID: But --

MR. MAZUREK: It's part of the claims by the complaining witness, part of the actual sexual crimes or the sexual conduct.

THE COURT: These statements may be read aloud or testified about at trial. Do you believe exposure to such graphic evidence may affect your ability to hear and consider the evidence in the case with an open mind and your ability to be fair and impartial?

MR. MAZUREK: Yes.

THE COURT: So I'm now getting rid of 4 and just folding in including oral or anal sex into 6, correct?

MR. MAZUREK: Correct.

THE COURT: Any objection, Mr. Mazurek [MA/ZUR/EK]?

MR. MAZUREK: No, and it's Mazurek [MA/ZOOR/EK], but.

THE COURT: Mazurek [MA/ZOOR/EK]. I wanted you to tell me that at the very beginning.

MR. MAZUREK: Oh.

THE COURT: Okay.

MR. MAZUREK: Everybody calls me Mazurek.

MS. REID: Your Honor, the last thing I would say is, again, I agree with the Court in not wanting to preview evidence. I'm honestly not sure that at anal sex will be mentioned during this trial. Perhaps it will, but we don't know for sure.

I think oral sex is more likely. I think oral sex is

really not something that most people have strong beliefs against. So I just don't think it's necessary and it's setting the jury up almost for things that may or may not even happen.

MR. MAZUREK: I mean, there are statements in 3500 material of the complaining witness that talk about anal sex.

THE COURT: I will just say Ms. Reid, Ms. -- I hear you, but again, because this is Mr. Daskal's life on the line, and I do believe that I should give the Defendant as much as I can give without it being, as I say, making this a tutorial about either religion or sexual practices.

So I will include oral and anal sex in Question 6 and see if that prompts anybody to say that they would not be able to fair and impartial, but I won't give it as a separate question.

Okay, so now we're through sexual abuse and we've done some of the evidence evaluation. The law enforcement was Government's 9 and Defendant's 10.

And again, I don't think they're so different. I'm just going to harmonize them. So it's Mr. Daskal's Question 9 and it's the Government's Question 10.

MR. MAZUREK: Mr. Daskal's Question 10.

THE COURT: Oh, I'm looking.

MR. MAZUREK: And their 9.

THE COURT: Yes.

MR. MAZUREK: Very similar, very close.

THE COURT: Okay, so that's not a big deal. Then the only things that I -- I generally don't ask about military service.

And that's something that the Government asked me to put into, you know, when we get to the end and we ask everybody. Any objection to asking about military service?

MR. MAZUREK: No, actually, I join for once the Government's request.

THE COURT: Okay, so I'll add that in. Were there any other things on the voir dire that we need to fight about?

MS. REID: Your Honor, I just -- so our -- if there's other questions in the Government's submission that we haven't discussed to be as --

THE COURT: So I'll tell you. In the Government's submission, I thought I was going to do -- and just to be clear, I only read the title of the Superseding Indictment, Mann Act coercion and enticement and transportation of minor with intent to engage in criminal sexual activity.

I just read the titles. I tell them the indictment is just the charge. It has no weight. It's not anything that they by me saying it should think is true. That's all I say about the indictment, okay?

I was going to ask 1, 2, 3, 4, 5. 6 has now been sort of merged with Mr. Daskal's 6. Your 6 is because of the nature of the charges, you may be required to review sexually

explicit communications involving an alleged minor. These messages and the related testimony may be distasteful, offensive, and unpleasant to view and hear. However, the prospect of having to see or hear distasteful, offensive, or unpleasant evidence is not the basis to avoid the responsibility. You go on a bit.

MR. MAZUREK: It's very long.

THE COURT: I wasn't going to give all of it.

MR. MAZUREK: Okay.

THE COURT: I was going to merge it with your 6, which is will they be able to be fair and impartial and will they -- will the exposure to the graphic evidence be something. I'm -- I give my own wrap about their constitutional obligation to serve as jurors.

And believe me, if somebody comes to sidebar and gives me some bogus reason for why they're trying to get out, they'll hear it from me, but I don't like to go through this long. So, that one, I was not going to give the full extent.

MR. MAZUREK: Your Honor, I specifically have an objection to the sentence that begins the parties have a right to expect. I think you will, as you said, give that by a different instruction.

THE COURT: I don't even see where that is.

MR. MAZUREK: It's on page 3.

THE COURT: Oh, I'm not giving any of that, Mr.

Mazurek.

MR. MAZUREK: Okay, Mazurek.

THE COURT: Mazurek, I'm stopping, you know, again, I believe because of the nature of the charges, they're going to here graphic evidence.

So I may merge some of that beginning with your 6. You might hear evidence of messages, conversations, testimony, that includes explicit discussion of sexual acts or patterns of sexual activity, including oral or anal sex.

I may add in because of the nature of the charges, you may be required to review sexually explicit communications involving an alleged minor.

MR. MAZUREK: I have no objection to that.

THE COURT: Okay. And then, it'll be these statements may be read aloud or testified about at trial. So I'm just taking a little bit of theirs and putting it in, but I'm not talking about how distasteful it is or whether or not it's a ground for them to get out of jury duty.

Okay, the 7, I think is a good instruction. I probably have something like that. This is Government saying the case may receive attention in the media. However, you can only consider what you hear in the courtroom. I think I say that about a million times. I'm not going to give 8.

MS. REID: Your Honor, that's one that I think is incredibly important in this case. And in other cases similar

to this one, it has been given.

I think I -- actually my last trial, this was a significant part of the voir dire process. A lot of people had trouble with this very basic legal principle that is incredibly important in this case.

THE COURT: So just for everybody who's sitting in the room, 8 is it is the law that the testimony of a single witness can be sufficient to convict a Defendant of a charged crime if the jury finds that the testimony of that witness establishes proof. I would add in of Defendant's guilt beyond a reasonable doubt.

Now wait, before you pop up --

MR. MAZUREK: Okay.

THE COURT: -- I'm not going to ask do you have any opinion or belief. I would just say would you be able to follow that instruction.

MS. REID: That's fine, Your Honor. Thank you.

MR. MAZUREK: I object.

THE COURT: Okay, tell me?

MR. MAZUREK: And Your Honor, I have also seen this request from the Government before. And I think it is extremely prejudicial to our client because it singles out a specific piece of evidence before we even start trial. And --

THE COURT: What's the specific piece of evidence that it --

MR. MAZUREK: About a single witness can be sufficient. And that is just another way of saying that the complaining witness -- you can convict just based on what a complaining witness says. And --

MS. REID: You can, Your Honor.

MR. MAZUREK: -- that's not even true in the sense --

MS. REID: That is true, Your Honor.

MR. MAZUREK: Well --

THE COURT: Well, if they credit the complaining witness, then --

MR. MAZUREK: But it has to be -- that testimony has to be considered in conjunction with all the other evidence in the case. It can't just be isolated to the testimony of a single witness.

THE COURT: I hear you, which is why I said if the jury finds that the testimony of that witness establishes proof of Defendant's guilt beyond a reasonable doubt. It has to be each of the elements of the crimes that are charged that the testimony bears out.

MR. MAZUREK: But what I'm saying is it's telling the jury that you can almost isolate that single piece of evidence that comes during the jury trial without considering it in the context of all the other evidence in the case, but you can't just listen to the credibility of a single witness and make

that determination.

You have to do it in conjunction with all the other evidence, how it compares to the physical evidence, or the forensic evidence, or contradictions in other testimony of other testimony from other witnesses.

THE COURT: Isn't that what saying establishes proof of Defendant's guilt beyond a reasonable doubt?

MR. MAZUREK: No, because it's just isolating the testimony of a single witness.

MS. REID: Your Honor, the Defense has isolated this witness with the other instructions. They've made it very clear to focus on this.

And this is the law that most people actually don't know. This is the law that I expect Judge Garaufis will instruct them on. And by then, it's too late.

There are people that don't understand and that will not feel comfortable. This is a case with actions that happen behind closed doors. There's a single witness, who will testify about some of those things. And the jury has to know that it's the law that that can be sufficient.

THE COURT: I agree and I will give it as modified. It is the law that the testimony of a single witness can be sufficient to convict a Defendant of a charged crime if the jury finds that the credible testimony.

I'm going to add in credible, that the credible

testimony of that witness establishes proof of guilt beyond a reasonable doubt.

So I'm going to add in credible testimony of that witness establishes. And I'm going to add in of Defendant's guilt proof of Defendant's guilt beyond a reasonable doubt. Would you be able to follow that instruction?

MR. MAZUREK: Your Honor, would you consider adding a sentence which I think is also conditioned in the normal jury instruction with respect to that, that says of course, that testimony will have to be viewed in the context of all the other evidence that you hear.

THE COURT: You're going to get that in the jury instruction that Judge Garaufis will give. That's not for now. This is just picking the jury.

She is identifying that because of TV and other things, some people think that you have to have DNA evidence to convict somebody and you need to have five different people come to the witness stand.

Her -- she is telling the truth that this is contested in a number of cases, but I have given this as a question in voir dire before in cases similar to this.

MR. MAZUREK: A continuing subject for the record.

THE COURT: You can object. Okay, the other thing is the Borough Park. And I'm really --

MR. MAZUREK: Judge, I'm sorry. Not to interrupt --

THE COURT: Yes.

MR. MAZUREK: -- but with respect to number 7, the only thing I want to -- the Government's number 7 with respect to media coverage.

THE COURT: Yes.

MR. MAZUREK: I just want to alert the Court while he may not be a "Daily News" reader, the "Daily News" did a two-page article this week on this case specifically. So I think we shouldn't just say may receive. I think we have to say it has received attention in the media and if they have seen that article or read anything about this particular case.

THE COURT: So you wanted to say this case has received attention in the media?

MS. REID: That's fine, Your Honor.

THE COURT: And however, the only evidence you should consider is the evidence received in the courtroom. You're to ignore any statements made by the media or individuals on social media. I'm just going to end it there.

MR. MAZUREK: Okay.

THE COURT: Not say which may be inaccurate or incomplete. And I'm going to say has anybody read anything? I've already had that in somewhere. And I'm going to ask them to follow their oath and follow the instruction to ignore anything that is about this case.

MR. MAZUREK: I'm sorry, but is there a -- I don't

remember now, is there a specific question earlier where we've asked them if they have read or received any information?

THE COURT: It's in my --

MS. REID: (Indiscernible.)

THE COURT: -- regular script and again.

MS. REID: And also, it's Defendant's question number 12.

MR. MAZUREK: Yes, we would ask for -- continue to ask for it.

MS. REID: I think the Court indicated that you would read that.

THE COURT: Yes.

MS. REID: Okay, great. Sorry, I missed that.

THE COURT: Yes, when we were going over the knowledge of the case and the people and arguing about Hasidic, we went over that one. Okay.

Is there going to be anybody who testifies in any other language?

MS. REID: Um --

MR. MAZUREK: Maybe some Yiddish.

MS. REID: What about his people?

MR. MAZUREK: Oh, she --

MS. REID: She might -- there may be some Hebrew or Yiddish.

THE COURT: Are we getting an interpreter?

MS. REID: That's -- it's a Defense witness, Your Honor.

MR. MAZUREK: Yes.

THE COURT: You are going to get an interpreter?

MR. MAZUREK: Yeah, I've asked for Ms. Finkle (phonetic)? Okay.

THE COURT: Yes, the answer's yes?

MR. MAZUREK: Yes.

THE COURT: So then, I'm --

MR. MAZUREK: No, I contacted Ruth Cohen (phonetic), I think if it helps.

THE COURT: I'm not concerned with who you've contacted. I'm concerned with asking whether if somebody speaks another language, will they be able to take the interpreter's --

MR. MAZUREK: Oath.

THE COURT: -- translation.

MR. MAZUREK: Yes.

THE COURT: That's what I would --

MR. MAZUREK: Yes.

THE COURT: -- put into the jury instruction, okay?

MR. MAZUREK: Yes.

THE COURT: Even if they're able to understand that language, will they be able to credit the interpreter's translation.

Okay, that's all that I have, so --

MR. MAZUREK: Oh, Judge?

THE COURT: Yes.

MR. MAZUREK: Could I join in another Government's question that they have in theirs? I would ask that you do give just the catch-all question number 14.

THE COURT: I won't ask it that way, but I will ask a catch-all question is there any other question that I haven't asked that you would -- would make it difficult for you to be fair and impartial in this case to them to volunteer.

MR. MAZUREK: Okay.

THE COURT: I will also ask if they have any religious -- just my usual script. Do you hold any religious beliefs that would prevent you from passing judgment on another person. And having heard all of these questions, which I've put to you, is there any other reason that suggests itself to you as to why you could not sit on this jury and render a fair verdict based on the evidence presented to you and consistent with the laws Judge Garaufis instructs you on?

MR. MAZUREK: Great.

THE COURT: So that's my (indiscernible), okay? We still didn't get the one other thing that we didn't get is Borough Park.

MS. REID: Right.

THE COURT: I have it on the list, so that if

somebody has a strong affinity, they're hopefully going to raise their hand. But as I said, it doesn't -- that somebody knows where Borough Park is or even lives there or lives in Fallsburg, I don't think, will get anybody from Fallsburg because it's not in the --

MR. MAZUREK: Southern District.

THE COURT: -- Eastern District.

MR. MAZUREK: Yeah.

THE COURT: So I don't want to ask a separate question, but you did have a separate question on your list, Ms. Reid, you have 10

MS. REID: Yeah, I don't think we need it, Your Honor, I agree.

THE COURT: Okay, so --

MR. MAZUREK: There's also going to be discussion of Chicago here.

MS. REID: There is. We didn't list that because we thought we could list Chicago, but I can't imagine --

THE COURT: I -- again, it's like listing JFK.

MS. REID: Yeah.

THE COURT: -- in a drug case.

MS. REID: Correct.

THE COURT: I don't need to list JFK here, all right? Were there other matters, Ms. Reid, that needed to be brought to my attention?

MS. REID: No, thank you, Your Honor, I don't think so.

THE COURT: And, again, everybody knows that by tomorrow, and I'm going to say by 2:00 tomorrow, if they haven't given me changes to this list, I don't want this to be a surprise on Monday. I want to have the right number of copies to put on everybody's chair. Everybody understands that 8:30 Monday is Judge Garaufis' courtroom and we'll repeat that to the court reporter. Sometimes they show up here and we don't have our court reporter where we need them.

Now I'm confused, Mr. Mazurek?

MR. MAZUREK: No, Mazurek.

THE COURT: Mazurek.

MR. MAZUREK: Why can't you do it?

THE COURT: I'm going to -- okay, Mr. Mazurek.

MR. MAZUREK: You're just teasing me, I think.

THE COURT: No, I'm not. I'm sorry, I'm just tired. You've worn me out, but I won't get your client's name wrong. And you, I could just call counsel, right?

So was there anything else that needed to be raised on behalf of Mr. Daskal?

MR. MAZUREK: Your Honor, will we received your final list of questions --

THE COURT: No.

MR. MAZUREK: -- in print before?

THE COURT: You will not.

MR. MAZUREK: No.

THE COURT: You will not. This was pretty extensive. And you got the gist. And I'm not going to try to surprise anybody, but no, you're not going to get my list of questions just like you're not going to get the jurors that are showing up on Monday morning at 8:30.

So we'll all be there bright and early. And if there's anything that needs to be raised, we'll raise it before the jurors come in. So thank you, everybody for your patience and your attention. I'll see you on Monday. Thank you.

MS. REID: Thank you, Your Honor.

(pause)

THE COURT: So Judge Garaufis has referred this to me for jury selection. However, I need to get Mr. Daskal to consent for the purpose of jury selection that I'm overseeing this.

And there is a form, and I will bring it on Monday for you to sign, Mr. Daskal, but I'd ask that you discuss this with your attorney.

And on Monday before we get the jurors come in, I'm going to ask you have you reviewed the form. Is it your signature on it that consents to have me select the jury no other purpose in this?

So I just want it to be on the record that that's

something if you had any questions that you should discuss with your counsel this weekend, okay, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay, very good. This matter's adjourned. Thank you.

MS. REID: Thank you.

(Proceedings concluded at 12:32 p.m.)

**CERTIFICATE**

I, Chris Hwang, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____          July 14, 2023
Chris Hwang                Date
Court Reporter